HaRRis, Special J.,
delivered the opinion of the court.
This bill is brought to set aside two conveyances, one executed by complainant to Cabiness and wife, on the 10th July, 1848, for six negro slaves and other property therein mentioned The bill charges that complainant, at the time of the execution of the bill of sale, was about seventy years of age, confined to her bed, and had been for several months by a severe and protracted illness, reduced in body and mind to extreme infirmity. While in that situation, Cabiness and wife came to the house of Mrs. Susan Anthony, where complainants then resided, and urged her by almost every inducement to go home with them — giving her assurances of the kind offices they would do for her, by which they had no doubt she would soon be restored to her health. She declined accepting their proffered kindness; but in a short time Mrs. Cabiness made a second visit and she yielded to her importunities, consented to go, and was hauled over, on her bed, in a wagon to the house of said Cabiness. She had been left a widow about three years before; old, infirm, and entirely ignorant of all kinds of business except her domestic affairs ; with a stock, a farm, and about seventeen slaves, and surrounded by designing relations, who desired her property. She had been induced to give away and to sell all her property, except that conveyed in said bill of sale. Among others, she had, on the 7th day of February, 1848, given to Mi’s. Cabiness, a negro girl, Louisa, and two others to Mrs. Anthony. Soon after her arrival at the *476 house of Cabiness, their importunities took a different direction , they told her that her property was liable for the debts of her son, William N. Anthony, then lately deceased, and who was supposed to be very much in debt, and as a means of saving it for her from the payment of said debts, they urged her to make a conveyance to them; that they did not desire the property, but only wished to save it for her, and would re-convey it whenever she desired. Reposing unlimited confidence in the friendship and advice of said Cabiness and wife, she yielded to their importunities, and J. W. Needham was sent for to prepare the conveyance — that before Needham arrived, Mrs. Cabiness told complainant that as her recollec-lection was very bad, she had better not say anything to him about their conversations and understandings.
At the same time that Needham drew the bill of sale, Cabiness and wife, in addition to and in violation of any previous agreement, caused said Needham to draw a bond, by which they bound, or pretended to bind themselves, to support complainant during her life; to which, at the time complainant made no objection, being feeble in body and mind, not understanding the object of said paper, but supposing it to be a necessary part of the agreement, relying at the time with perfect assurance upon the promises of said Cabiness and wife.
Soon after the execution of the bill of sale, however, there was a manifest change in the deportment of Cabiness and wife. The former talked of taking the servant of complainant, whom she had brought there to wait upon her, from her bedside, to labor in the field; whereupon, she returned to the house of Mrs. Anthony. She charges that Cabiness and wife did not give or promise to give any consideration for said property, and that in violation of their promises they had recently taken the same in possession and are claiming it as their own. That soon after her return to Mrs. Anthony’s, still enfeebled both in body and mind, as above set forth, Mrs. *477 Anthony induced her to believe that the only means by which she coaid recover her property from Cabiness and wife, was to sell and convey it to her, assuring complainant at the same time, that all she wanted was to get the property alone for her, and that it should still be her property. In this situation, weak, helpless and distressed at what she had done, ignorant of the way of escape and influenced and led by the representations of Mrs. Anthony, on the 16th August, 1848, she executed a conveyance to her for the same property. That she did not intend by either of these conveyances to part with the property, nor did she suppose that she had done so, as on both occasions she was assured that the only object was to save the property for her. The bill also charges that Mrs. Anthony had sold out and assigned her interest in said property to Cabiness and wife, and that they were about to sell said ne-groes, &c.
The bill prays (among other things,) that said conveyances of the 10th July, to Cabiness and wife, and of the 16th August, to Mrs. Anthony, be declared void, and that the property be restored to complainant.
The answers of Cabiness and wife admit the execution of the bill of sale by complainant, on the 7th February, 1848, to Mr. Cabiness, for the slave Louisa, and also the bill of sale of the 10th July, 1848, for the slaves and the other property in controversy. That complainant is the sister of Mrs. Cabiness, was at that time about 70 years of age, and that said conveyances were made in consideration of natural love and affection, and the further consideration that Cabiness and wife would execute their obligation to clothe, maintain and support her during her life, which obligation they executed on the 10th July, 1848, when the last bill of sale was executed, and it was placed in the hands of J. W. Needham, for safe keeping, a copy of which they file with their answer. They deny that at the time she executed the bill of sale on the 10th July *478 1848, she had been confined her to bed by severe illness for several months, and that her body and mind were reduced to extreme infirmity; but admit that she was afflicted in her limbs so that she could not walk. Deny that her mind was enfeebled, and that she did not understand the full tenor, purport and meaning of the transaction, and asserts that “ she knew well, considered well, and understood well, what she was doing, and acted on her own judgment, uninfluenced by respondents.” Deny that they went after complainant to to bring her to their house; but admit that Mrs. Cabiness, learning that she desired to come, went for her, but in that she was governed by the feelings of a sister, and not from any design on her property. That she came to defendants because she wanted to come, but not from any pursuasion or influence, as charged in the bill. They deny that they ever told her that her property was liable for the debts of Willi am N. Anthony, and that they agreed that they would hold it for her, and would re-convey it to her whenever she desired. Deny that Mrs. Cabiness advised complainant, that as her recollection was bad, she had better not say anything of their conversations and understandings to Needham, when he came to do the writing. At a word, they deny all tfie material allegations in the bill.
William Hobbs (a witness for complainant,) states that he saw complainant at the house of defendants, that “ she was very bad off and not able to help herself.” That he had heard both Cabiness and wife say that they had no use for the property — that they had no children to leave it to, and that they had property enough for themselves, and that the conveyance was only made to keep from paying William N. Anthony’s gambling debts, and that they would give it back whenever she desired; that the object was to hold it for her use and benefit, and that it was made without any consideration on their part.
*479 A. S. Undcrwoodproves that he was complainant’s physician in July, 1848. He considered her an old lady possessing very ordinary intellect at best — that her mind was somewhat impaired in consequence of protracted illness at that time; that she was fickle minded and easily wrought upon by a friend or supposed friend. Had heard Mrs. Cabiness say that the object of the conveyance was to secure to complainant the property from the payment of W. N. Anthony’s debts, and that they would do anything with it complainant desired.
On cross examination, he stated that her mind was considerably enfeebled and impaired in consequence of the diseased condition of her body, and the murder of her son, which occurred some months previous.
A. C. Pierce states that he had heard Mrs. Cabiness say frequently, that she wished to get the complainant to her house, “ to have things'fixed to her own notionthat she knew she could get it done if she could get her away from the Widow Anthony; heard her persuade complainant to go home with her. The mind of complainant was weak and changeable. Had heard Mrs. Cabiness say that her mind was as changeable as the wind, and that Mrs. Anthony could change her mind from one thing to another, or make her believe anything. Had heard defendant say several times that the property was transferred to them for no other purpose than to keep from paying Anthony’s debts, and that they would when called upon by complainant, give it back or dispose of it as she might direct them to do. That in the early part of her illness, complainant had made a will, in which she had given most of her property to Mrs. Anthony, with which Mr. and Mrs. Cabiness were greatly dissatisfied and troubled.
T. J. Conley states he had heard Mr. Cabiness and complainant both say that the conveyance was not made to keep from paying just debts.
W. Wisener states, Cabiness and wife told him that the con *480 veyance was not made to keep from paying just debts ; that they had no use for the property — that it was at the disposal of complainant at any time/and that they were holding it for her benefit, but that it should not go to pay Anthony’s gambling debts. He heard Mrs. Cabiness persuade complainant several times to go home with her, and after she had got her in the wagon, she observed, “ we will have things turned to our notion before she comes back again; that she could have the property conveyed when she got her away from Mrs. Anthony.” That at that time complainant was very weak, both in body and mind.
Samuel M. Pierce proves that Mrs. Cabiness had frequently persuaded complainant to go to her house, and that he had heard her say if she could get her there she would have Mr. Needham there, and she would make the old lady fix things to her notion, for Mr. Needham was as good to write deeds or anything of the kind as any lawyer in the State. Pie had heard Cabiness and wife both tell complainant that if she did not fix her property in some way, it would all be taken to pay Anthony’s debts.
After the conveyance they told him it was not made to keep from paying just debts, but to avoid the papment of Anthony’s gambling debts, and that they would convey it back to her whenever she desired, that it was all a sham.
Mrs. Cabiness told witness that she requested complainant not to talk any before Needham, that he was coming there to write the deed, and that if she talked much before him he would find out that she did not have much sense and that he could not do anything; but when Needham commenced writing, the old lady commenced talking, and he laid down his pen and said that he could not write there, and went out of the house and wrote the deed.
J. W. Needham proves that the complainant told him about one month before the execution of the bill of sale, that she *481 had made a will, which was in the possession of Mr. Rains, and from her recollection, and from what others had tc-ld her she was dissatisfied with its provisions, that by her will she had given most of her property to Mrs. Anthony. That about the 10th July, 1848, Mr. Cabiness told him that complainant ■wished to see him at defendants house on some of her business. That when he went to the house of defendant, complainant asked him if she could be made to pay Anthony’s gambling debts ? He informed her she could not. She asked if she could be compelled to pay his other contracts ? He informed her that that depended upon circumstances, that if she had been in the habit, or in any way authorised, or suffered him to make contracts for her, she would be bound to pay thém. She said that she had never authorised him to contract those debts.
Crawford and Garwood were also examined, who thought her mind good.
The question presented is, should the deed procured under the circumstances disclosed in the proof, be set aside, and the property restored to the complainant ? From the facts in the record, we are well satisfied that the complainant is an old lady of very feeble intellect at best; and at the time of the execution of the deeds, that intellect was greatly impaired by protracted disease and mental distress ; and that they were obtained, too, by persons who at the time commanded her entire confidence, and exercised over her an undue and improper influence. That defendants, Cabiness and wife, persuaded her to their house, from the proof there can be no doubt, and that the object was to get •* things fixed to their own notion,” there can be as little.
The proof presents her as . imbecile, forlorn, helpless, and distressed; having within three years lost her husband, and very recently her son ; possessing a handsome estate, but surrounded by a set of designing relations, who looked on each *482 other with jealousy, and were engaged in a continuous strife as to who was to be most successful in taking advantage of her infirmities and fleecing her of her property; impatient at being kept out of possession of the same by her living entirely too long to suit their convenience.
She was not only assailed by continued importunities, but it is most manifest, that through her infirmities and credulity, she was made the victim of fraud. She was induced to believe that her proprerty was liable for the debts of her deceased son, which were said to be numerous, and to protect it from the payment of the same, the conveyance to defendants, Cabiness and wife, of the 10th July, 1848, was obtained, under promises that it should be held for her use and re-conveyed to her whenever she desired.
Soon after this conveyance she was made sensible of the fraud and imposition which had been practiced upon her, and as she supposed, to relieve herself from which, she made the conveyance to Mrs. Anthony, who proposed to get the property back for her; instead of which, however, she has conveyed her claim, thus fraudulently obtained to defendants, Cabiness and wife.
Mr. Justice Story, in the first volume of his treatise upon equity jurisprudence, lays down the general principles that “ contracts are utterly void when made by a person, though not positively non compos or insane, is yet of such great weakness of mind, as to be unable to guard himself against imposition, or to resist importunity or undue influence- And it is quite immaterial from what cause such weakness arises ; whether it arises from temporary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those incidental depressions which result from sudden fear, or constitutional despondency, or overwhelming calamities.” Section 234.
For it has been well remarked, that, although there is no di *483 rect proof that a man is non compos, or delirious ; yet if he is a man of weak understanding, and is harrassed and uneasy at the time, &c., it cannot be supposed that he had a mind adequate to the business which he was about, and he might be very easily imposed upon. It is said that, if a weak man give a bond and there is no fraud or breach of trust in obtaining it, equity will not set it aside only for the weakness of the obligor, if he be compos mentis; neither will equity measure the size of people’s understandings and capacities, there being no such thing as an equitable incapacity, when there is a legal capacity. Section 235.
But whatever weight there may be in this remark in a general sense, it is obvious that weakness of understanding must constitute a most material ingredient in examining, whether a bond or other contract has been obtained by fraud or imposition or undue influence; for, although a contract made by a man of sonnd mind and fair understanding, may not be set aside, merely from its being a rash, improvident, or hard bargain ; yet if the same contract be made with a. person of weak understanding, there does arise a natural inference that it was obtained by fraud or circumvention or undue influence. Those who, from imbecility of mind, are incapable of taking care of themselves are under the special protection of the law. The strongest mind cannot always contend with deceit and falsehood. A bargain, therefore, into which a weak one is drawn under the influence of either of these, ought not to be held valid; for the law requires that good faith should be observed in all transactions between man and man.
A degree of weakness of intellect, far below that which would justify a jury in pronouncing a verdict of lunacy, coupled with other circumstances to show that the weakness, such as it was, had been taken advantage of, will be súfiicient to set aside any important deed. Section 237. Upon these principles, from the facts before us, we have no doubt but that *484 the complainant is entitled to the entire relief prayed for, and that the decree of his Honor the Chancellor dismissing the bill, should be reversed, and decree rendered for complainant.